# Exhibit 1

**SUMMONS**
*(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Monsanto Company; Steven D. Gould; Wilbur-Ellis Company, LLC;
Wilbur Ellis Feed, LLC

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Dewayne Johnson

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* San Francisco Superior Court | **Case Number:**<br>*(Número del Caso):*<br>CGC-16-550128 |
|---|---|

400 McAllister Street, San Francisco, CA

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Curtis Hoke, 108 Railroad Ave, Orange VA 22960 540-672-4224

| DATE:<br>*(Fecha):* JAN 2 8 2016 | CLERK OF THE COURT<br>*(Secretario)* | , Deputy<br>*(Adjunto)* |
|---|---|---|

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☐ on behalf of (specify):

   under: ☐ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other (specify):
4. ☐ by personal delivery on (date):

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. July 1, 2009)

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

Curtis G. Hoke (SBN 282465)
THE MILLER FIRM, LLC
108 Railroad Ave.
Orange, VA 22960
Telephone: (540) 672-4224
Facsimile: (540) 672-3055
choke@millerfirmllc.com
*Attorneys for Plaintiffs*

16 JAN 28  PM 12: 52

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SAN FRANCISCO

## (UNLIMITED JURISDICTION)

DEWAYNE JOHNSON,

Plaintiff,

vs.

MONSANTO COMPANY;
STEVEN D. GOULD;
WILBUR-ELLIS COMPANY, LLC; and
WILBUR-ELLIS FEED, LLC,

Defendants.

Case No. CGC - 16 - 550128

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1. Strict Liability – Design Defect
2. Strict Liability – Failure to Warn
3. Negligence
4. Breach of Implied Warranty
5. Punitive Damages

JURY TRIAL DEMANDED

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, by attorneys, THE MILLER FIRM, LLC, as and for the Complaint herein alleges upon information and belief the following:

## STATEMENT OF THE CASE

1.    In 1970, Defendants Monsanto Company, Inc. discovered the herbicidal properties of

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State bar number, and address):
Curtis G. Hoke (SBN 282465)
The Miller Firm, LLC
108 Railroad Ave.
Orange, VA 22960

TELEPHONE NO: 540-672-4224   FAX NO: 540-672-3055
ATTORNEY FOR (Name): Dewayne Johnson (Plaintiff)

SUPERIOR COURT OF CALIFORNIA, COUNTY OF: San Francisco
STREET ADDRESS: 400 McAllister St.
MAILING ADDRESS: 400 McAllister St.
CITY AND ZIP CODE: San Francisco CA 94102
BRANCH NAME: Civic Center

CASE NAME:
Johnson v. Monsanto, et al

**CIVIL CASE COVER SHEET**

[✓] Unlimited  [ ] Limited
(Amount demanded exceeds $25,000)  (Amount demanded is $25,000 or less)

Complex Case Designation
[ ] Counter  [ ] Joinder
Filed with first appearance by defendant
(Cal. Rules of Court, rule 3.402)

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[✓] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[✓] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation**
(Cal. Rules of Court, rules 3.400–3.403)
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is  [✓] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a.[✓] monetary  b.[ ] nonmonetary; declaratory or injunctive relief  c.[✓] punitive
4. Number of causes of action (specify): 5
5. This case [ ] is  [✓] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related cases. (You may use form CM-015.)

Date: 1/27/2016

Curtis G. Hoke
(TYPE OR PRINT NAME)                  (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 (Rev. July 1, 2007)

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

Curtis G. Hoke (SBN 282465)
THE MILLER FIRM, LLC
108 Railroad Ave.
Orange, VA 22960
Telephone: (540) 672-4224
Facsimile: (540) 672-3055
choke@millerfirmllc.com
*Attorneys for Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SAN FRANCISCO

## (UNLIMITED JURISDICTION)

| | |
|---|---|
| DEWAYNE JOHNSON, | Case No.: |
| Plaintiff, | |
| vs. | **COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |
| MONSANTO COMPANY;<br>STEVEN D. GOULD;<br>WILBUR-ELLIS COMPANY, LLC; and<br>WILBUR-ELLIS FEED, LLC, | 1. Strict Liability – Design Defect<br>2. Strict Liability – Failure to Warn<br>3. Negligence<br>4. Breach of Implied Warranty<br>5. Punitive Damage |
| Defendants. | **JURY TRIAL DEMANDED** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, by attorneys, THE MILLER FIRM, LLC, as and for the Complaint herein alleges upon information and belief the following:

## STATEMENT OF THE CASE

1.  In 1970, Defendants Monsanto Company, Inc. discovered the herbicidal properties of

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
1

glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

2.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

3.      Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

4.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides,

including glyphosate. That evaluation was based, in part, on studies of exposure to glyphosate in several countries around the world, and it raises the health implications from exposure to glyphosate since 2001.

5. On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6. The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

3

## JURISDICTION AND VENUE

9.      The California Superior Court has jurisdiction over this action pursuant to California Constitution Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other trial courts." The Statutes under which this action is brought do not specify any other basis for jurisdiction.

10.      The California Superior Court has jurisdiction over the Defendants because, based on information and belief, each is California resident, a corporation and/or entity organized under the laws of the State of California, a foreign corporation or association authorized to do business in California and registered with the California Secretary of State or has sufficient minimum contacts in California, or otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

11.      Venue is proper in this Court pursuant to California Code of Civil Procedure Section 395 in that the Defendants Wilbur-Ellis Company, LLC and Wilbur-Ellis Feed, LLC are headquartered and maintain their principal place of business in San Francisco.

12.      Furthermore the Defendants have purposefully availed themselves of the benefits and the protections of the laws within the State of California. Monsanto has had sufficient contact such that the exercise of jurisdiction would be consistent with the traditional notions of fair play and substantial justice. Steven Gould is a resident of California.

13.   Plaintiff seeks relief that is within the jurisdictional limits of the Court.

## THE PARTIES

### Plaintiff

14.   Plaintiff Dewayne Johnson is a competent individual over the age of 18, a resident and citizen of the United States, and hereby submits to the jurisdiction of the Court and alleges that venue in this court is proper. He currently resides in Vallejo, California.

### Defendants

15.   Defendants Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®. Monsanto has regularly transacted and conducted business within the state of California, and has derived substantial revenue from goods and products, including Roundup, used in the State of California. Monsanto expected or should have expected their acts to have consequences within the State of California, and derived substantial revenue from interstate commerce.

16.   Defendants Wilbur-Ellis Company LLC is a California limited liability corporation with its headquarters and principal place of business in San Francisco, California. At all times relevant to this complaint, Wilbur-Ellis Company, LLC sold and distributed Monsanto products including Roundup, within the State of California.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

5

17.     Defendants Wilbur-Ellis Feed LLC (with Wilbur-Ellis Company LLC, hereinafter "Wilbur-Ellis") is a California limited liability corporation with its headquarters and principal place of business in San Francisco, California.  At all times relevant to this complaint, Wilbur-Ellis Feed, LLC sold and distributed Monsanto products including Roundup, within the State of California.

18.     Defendants Steven Gould is employed by Monsanto as its national industrial, turf and ornamental herbicide National Account Manager, and is a competent individual over the age of 18 and a resident of Riverside County, California.

19.     Plaintiff is informed and believes, and based thereon alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendants was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers and/or managing agents.

## FACTS

20.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

21.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

6

necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

22.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed.

23.     Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

24.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe"

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

7

general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

25.    The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

26.    Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

27.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus

requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

28.    The EPA and the State of California registered Roundup® for distribution, sale, and manufacture in the United States and the State of California.

29.    FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

30.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

31.    In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the registration process—no later than July 2015.

The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

*Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

32.   Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

33.   On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

34.   In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

35.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

36.    Three top executives of IBT were convicted of fraud in 1983.

37.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

38.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

39.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But

with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

40.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

41.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

*Monsanto has known for decades that it falsely advertises the safety of Roundup®*

42.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides,

including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

43.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

* * *

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

* * *

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

* * *

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

* * *

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
14

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

44.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

45.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

*Classifications and Assessments of Glyphosate*

46.    The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

47.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

48.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

49.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

50.     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

51.   On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

52.   The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

53.   Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

54.   Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
17

55.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

56.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

57.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

58.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

59.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

60.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

61.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

62.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

*Other Earlier Findings About Glyphosate's Dangers to Human Health*

63.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
19

Release Patterns

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds in forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

64.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

*Recent Worldwide Bans on Roundup®/Glyphosate*

65.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup® are more widely known. The Netherlands

issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes

effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the

successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in

abundance to private persons. In garden centers, Roundup® is promoted as harmless, but

unsuspecting customers have no idea what the risks of this product are. Especially children are

sensitive to toxic substances and should therefore not be exposed to it."

66.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice

Department suspend the use of glyphosate.

67.     France banned the private sale of Roundup® and glyphosate following the IARC

assessment for Glyphosate.

68.     Bermuda banned both the private and commercial sale of glyphosates, including

Roundup®. The Bermuda government explained its ban as follows: "Following a recent

scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup'

has been suspended."

69.     The Sri Lankan government banned the private and commercial use of glyphosates,

particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural

workers.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
21

70.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

71.     On information and belief, Wilbur-Ellis was, at all relevant times, engaged in the distribution of Roundup, Roundup-ready crops and other glyphosate-containing products from Monsanto to retailers and commercial/agricultural users in California.

72.     Wilbur-Ellis had superior knowledge compared to Roundup users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and/or marketing of Roundup with any warnings or precautions for that grave danger. On information and belief, Wilbur-Ellis was one of the distributors providing Roundup and other glyphosate-containing products actually used by the Plaintiff.

73.     Steven Gould is the National IT&O Account Manager for Monsanto, responsible for sales and marketing to distributors and users of Roundup and other glyphosate-containing products in California. Mr. Gould engaged in the marketing, promotion and sale of these products, aware of their carcinogenic or potentially carcinogenic properties, but failed to inform any of his sales targets of such danger.

*Plaintiff's Exposure to Roundup®*

74.    Plaintiff Dewayne Johnson was at all relevant times employed by the Benicia Unified School District, where his responsibilities included direct application of Roundup and RangerPro, another Monsanto glyphosate product, to school properties.

75.    Mr. Johnson was diagnosed with non-Hodgkin lymphoma in August 2014 at the age of 42.

## CLAIM ONE

## STRICT LIABILITY (DESIGN DEFECT)

76.    Plaintiff Incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

77.    Plaintiff brings this strict liability claim against Defendants for defective design.

78.    At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants. At all times relevant to this litigation, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products that Plaintiff was exposed to, as described above.

79.   At all times relevant to this litigation, Defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

80.   At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

81.   Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

82.   Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

83.   At all times relevant to this action, Defendants knew or had reason to know that i Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

84.   Therefore, at all times relevant to this litigation, Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

a. When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b. When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d. Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
25

f. Defendants knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g. Defendants did not conduct adequate post-marketing surveillance of its Roundup® products.

h. Defendants could have employed safer alternative designs and formulations.

85. Plaintiff were exposed to Defendants' Roundup® products while living on a commercial sod farm, as described above, without knowledge of its dangerous characteristics.

86. At all times relevant to this litigation, Plaintiff was exposed to the use of Defendants' Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

87. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

88. The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering Defendants' products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Roundup® products were and are more dangerous than alternative products and Defendants could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendants designed its Roundup® products, the state of

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
26

the industry's scientific knowledge was such that a less risky design or formulation was attainable.

89.    At the time Roundup® products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

90.    Defendants' defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff herein.

91.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendants are strictly liable to Plaintiff.

92.    The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiff' grave injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained their injuries.

93.    Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge

from the general public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

94.   As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

95.   WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM TWO

## STRICT LIABILITY (FAILURE TO WARN)

96.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

97.   Plaintiff brings this strict liability claim against Defendants for failure to warn.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
28

98.     At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and applying Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants.

99.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

100.    At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides, are held to the knowledge of an expert in the field.

101.    At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

102.    At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup, including Plaintiff.

103.    Despite the fact that Defendants knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

104.    Defendants knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendants have wrongfully concealed information concerning the dangerous nature of Roundup® and its

1   active ingredient glyphosate, and further made false and/or misleading statements concerning the

2   safety of Roundup® and glyphosate.

3

4

5   105.   At all times relevant to this litigation, Defendants' Roundup® products reached the

6   intended consumers, handlers, and users or other persons coming into contact with these

7   products in California and throughout the United States, including Plaintiff, without substantial

8   change in their condition as designed, manufactured, sold, distributed, labeled, marketed and

9   sprayed/applied by Defendants.

10

11

12   106.   Plaintiff was exposed to Roundup® products, as described above, without knowledge of

13   their dangerous characteristics.

14

15

16   107.   At all times relevant to this litigation, Plaintiff was exposed to the use of Defendants'

17   Roundup® products in their intended or reasonably foreseeable manner without knowledge of

18   their dangerous characteristics.

19

20

21   108.   Plaintiff could not have reasonably discovered the defects and risks associated with

22   Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure.

23   Plaintiff relied upon the skill, superior knowledge, and judgment of Defendants.

24

25

26   109.   Defendants knew or should have known that the minimal warnings disseminated with or

27   accompanying the application of Roundup® products were inadequate, but they failed to

28

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

110.   The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

111.   To this day, Defendants have failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

112.   As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were sold or distributed by Defendants, were applied by Defendants, and when Plaintiff became exposed.

113.   Defendants are liable to Plaintiff for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup® and glyphosate.

114.   The defects in these Roundup® products were substantial and contributing factors in causing Plaintiff' injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained their injuries.

115.   Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products and application, Plaintiff could have avoided the risk of developing injuries as alleged herein and the company who employed Plaintiff could have obtained alternative herbicides.

116.   As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce and exposing Plaintiff to them, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic

hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

117.    WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM THREE NEGLIGENCE

118.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

119.    Defendants, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

120.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product:

1    121.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care

2    in the marketing, advertisement, and sale of the Roundup® products. Defendants' duty of care

3    owed to consumers and the general public included providing accurate, true, and correct

4    information concerning the risks of using Roundup® and appropriate, complete, and accurate

5    warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular,

6    its active ingredient glyphosate.

7

8

9    122.    At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable

10   care, should have known of the hazards and dangers of Roundup® and specifically, the

11   carcinogenic properties of the chemical glyphosate.

12

13

14   123.    Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise

15   of reasonable care, should have known that use of or exposure to Roundup® products could

16   cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable

17   risk of injury to the users of these products, including Plaintiff.

18

19

20   124.    Defendants also knew or, in the exercise of reasonable care, should have known that

21   users and consumers of Roundup® were unaware of the risks and the magnitude of the risks

22   associated with use of and/or exposure to Roundup® and glyphosate-containing products.

23

24

25

26

27

28

125.   As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

126.   Despite ability and means to investigate, study, and test products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

127.   Defendants' negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and be exposed to its Roundup® products;

g. Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h. Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j. Representing that its Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

128.   Defendants knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

129.   Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

130.   Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

131.   Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of its products. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendants' reckless conduct therefore warrants an award of punitive damages.

132.   As a proximate result of Defendants' wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, have suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

133.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM FIVE

## BREACH OF IMPLIED WARRANTIES

134.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

135.   At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

136.   Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendants impliedly warranted to consumers and those exposed—including Plaintiff—that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

137.   Defendants, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

138.   Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon their implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

139.   Upon information and belief, Plaintiff was at all relevant times in privity with Defendants

140.   Plaintiff is the intended third-party beneficiaries of implied warranties made by Defendants to the purchasers of their horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

141.   The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendants.

142.   At all times relevant to this litigation, Defendants were aware that consumers and users of their products, including Plaintiff, would use Roundup® products as marketed by Defendants, which is to say that Plaintiff was a foreseeable user of Roundup®.

143.   Defendants intended that Roundup® products be used in the manner in which Plaintiff was exposed to them and Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

144.   In reliance upon Defendants' implied warranty, Plaintiff used or was exposed to Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendants.

145.   Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

146.   Defendants breached their implied warranty to Plaintiff in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

147.   The harm caused by Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

148.   As a direct and proximate result of Defendants' wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

149.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT SEVEN PUNITIVE DAMAGES

150.    Plaintiff repeats and reiterates the allegations previously set forth herein.

151.    At all times material hereto, the Defendants knew or should have known that the subject product was inherently dangerous with respect to its health risks.

152.    At all times material hereto, the Defendants attempted to misrepresent and did misrepresent facts concerning the safety of the subject product.

153.    Defendants' misrepresentations included knowingly withholding material information from the public, including the Plaintiff herein, concerning the safety of the subject product.

154.    At all times material hereto, the Defendants knew and recklessly disregarded the fact that human exposure to Roundup can and does cause health hazard, including non Hodgkin lymphoma.

155.    Notwithstanding the foregoing, the Defendants continued to aggressively market and apply the subject product without disclosing the aforesaid risks.

156.    Defendants knew of the subject product's defective and unreasonably dangerous nature, as set forth herein, but continued to design, develop, manufacture, market, distribute, sell, and apply it so as to maximize sales and profits at the expense of the health and safety of the public,

including the Plaintiff herein, in conscious and/or negligent disregard of the foreseeable harm caused by Roundup.

157.   The Defendants intentionally concealed and/or recklessly failed to disclose to the public, including the Plaintiff herein, the potentially life threatening hazards of Roundup in order to ensure continued and increased sales.

158.   The Defendants' intentional and/or reckless failure to disclose information deprived the Plaintiff of necessary information to enable Plaintiff to weigh the true risks of using or being exposed to the subject product against its benefits.

159.   As a direct and proximate result of the Defendants' conscious and deliberate disregard for the rights and safety of consumers such as the Plaintiff, Plaintiff suffered severe and permanent physical injuries. The Plaintiff has endured substantial pain and suffering and has undergone extensive medical and surgical procedures. Plaintiff has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. The Plaintiff has lost past earnings and has suffered a loss of earning capacity. The Plaintiff has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally and economically injured. The Plaintiff's injuries and damages are permanent and will continue into the future.

160.   The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including the Plaintiff herein, thereby

entitling the Plaintiff to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

161.   WHEREFORE, Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in their favor and against Defendants, awarding as follows:

A. compensatory damages in an amount to be proven at trial;

B. punitive damages;

C. costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

D. any other relief the Court may deem just and proper.

Respectfully submitted this 27th day of January, 2016.

THE MILLER FIRM, LLC

By /s/ Curtis G. Hoke
Curtis G. Hoke, Esq., SBN 282465
THE MILLER FIRM LLC
108 Railroad Ave.
Orange VA 22960
*Attorneys for Plaintiffs*

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
45

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Curtis G. Hoke (888 242483)
The Miller Firm, LLC
108 Railroad Ave.
Orange, VA 22960
TELEPHONE NO.: 540-672-4224   FAX NO.: 540-672-3055
ATTORNEY FOR (Name): Dewayne Johnson (Plaintiff)

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister St.
MAILING ADDRESS: 400 McAllister St.
CITY AND ZIP CODE: San Francisco CA 94102
BRANCH NAME: Civic Center

FOR COURT USE ONLY

CASE NAME:
Johnson v. Monsanto, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: |
|---|---|---|---|
| ☒ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:  DEPT: |

Items 1–6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

Auto Tort
☐ Auto (22)
☐ Uninsured motorist (46)

Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort
☐ Asbestos (04)
☒ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

Non-PI/PD/WD (Other) Tort
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

Employment
☐ Wrongful termination (36)
☐ Other employment (15)

Contract
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

Real Property
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

Unlawful Detainer
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

Judicial Review
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

Enforcement of Judgment
☐ Enforcement of judgment (20)

Miscellaneous Civil Complaint
☐ RICO (27)
☐ Other complaint (not specified above) (42)

Miscellaneous Civil Petition
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☐ is ☒ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. ☒ monetary   b. ☐ nonmonetary; declaratory or injunctive relief   c. ☒ punitive
4. Number of causes of action (specify): 5
5. This case ☐ is ☒ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: 1/27/2016
Curtis G. Hoke
(TYPE OR PRINT NAME)     (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

NOTICE
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]
CIVIL CASE COVER SHEET
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

1

2  Curtis G. Hoke (SBN 282465)
   THE MILLER FIRM, LLC
3  108 Railroad Ave.
   Orange, VA 22960
4  Telephone: (540) 672-4224
   Facsimile: (540) 672-3055
5  choke@millerfirmllc.com
   *Attorneys for Plaintiffs*
6

7              SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                IN AND FOR THE COUNTY OF SAN FRANCISCO

9                        (UNLIMITED JURISDICTION)

10

11  DEWAYNE JOHNSON,                    | Case No.:
                                        |
12          Plaintiff,                  |
                                        | AFFIDAVIT OF VENUE
13  vs.                                 |
                                        |
14                                      |
15  MONSANTO COMPANY;                   |
    STEVEN D. GOULD;                    |
16  WILBUR-ELLIS COMPANY, LLC; and      |
    WILBUR-ELLIS FEED, LLC,             |
17                                      |
18          Defendants.                 |

19

20                        __AFFIDVIT OF VENUE__

21  I, Curtis Hoke, declare as follows:

22          1.      I am an attorney at law licensed to practice before this Court and an associate at The

23  Miller Firm LLC, attorneys of record for Plaintiffs herein.

24          2.      On information and belief, venue is proper in the Superior Court of California –

25  San Francisco for the following reasons:

26                  a.      At all times relevant, the Defendants above were and are doing business in the State

27                  of California and San Francisco.

28                  b.      Defendants Wilbur-Ellis Company LLC and Wilbur-Ellis Feed, LLC are residents

                                        - 1 -

1   of California with a principal place of business in San Francisco.

2       3.      Based on the foregoing and pursuant to California Civil Code section 1780(d), this

3   action may be commenced in San Francisco.

4       I declare under penalty of perjury according to the law of the State of California that the

5   foregoing is true and correct. Executed this January 27, 2016, in Orange, Virginia.

6

7

8                                       Curtis G. Hoke,

9                                       *Declarant.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**

Monsanto Company; Steven D. Gould; Wilbur-Ellis Company, LLC;
Wilbur Ellis Feed, LLC

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**

Dewayne Johnson

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| The name and address of the court is:<br>(El nombre y dirección de la corte es): San Francisco Superior Court<br><br>400 McAllister Street, San Francisco, CA | CASE NUMBER:<br>(Número del Caso): |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Curtis Hoke, 108 Railroad Ave, Orange VA 22960  540-672-4224

| DATE:<br>(Fecha): | Clerk, by<br>(Secretario) | , Deputy<br>(Adjunto) |
|---|---|---|

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☐ on behalf of (specify):

   under: ☐ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
           ☐ other (specify):
4. ☐ by personal delivery on (date):

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Page 1 of 1

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov



# Superior Court of California, County of San Francisco
## Alternative Dispute Resolution
## Program Information Package



> The plaintiff must serve a copy of the ADR information package
> on each defendant along with the complaint. (CRC 3.221(c))

## WHAT IS ADR?

Alternative Dispute Resolution (ADR) is the term used to describe the various options available for settling a dispute without a trial. There are many different ADR processes, the most common forms of which are mediation, arbitration and settlement conferences. In ADR, trained, impartial people decide disputes or help parties decide disputes themselves. They can help parties resolve disputes without having to go to court.

## WHY CHOOSE ADR?

"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to trial." (Local Rule 4)

ADR can have a number of advantages over traditional litigation:

- **ADR can save time.** A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.
- **ADR can save money,** including court costs, attorney fees, and expert fees.
- **ADR encourages participation.** The parties may have more opportunities to tell their story than in court and may have more control over the outcome of the case.
- **ADR is more satisfying.** For all the above reasons, many people participating in ADR have reported a high degree of satisfaction.

## HOW DO I PARTICIPATE IN ADR?

Litigants may elect to participate in ADR at any point in a case. General civil cases may voluntarily enter into the court's ADR programs by any of the following means:

- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet)
- Indicating your ADR preference on the Case Management Statement (also attached to this packet); or
- Contacting the court's ADR office (see below) or the Bar Association of San Francisco's ADR Services at 415-782-8905 or www.sfbar.org/adr for more information.

For more information about ADR programs or dispute resolution alternatives, contact:

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA  94102
415-551-3869

*Or, visit the court ADR website at www.sfsuperiorcourt.org*

The San Francisco Superior Court offers different types of ADR processes for general civil matters: each ADR program is described in the subsections below.

## 1) SETTLEMENT CONFERENCES

The goal of settlement conferences is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of a dispute early in the litigation process.

(A) THE BAR ASSOCIATION OF SAN FRANCISCO (BASF) EARLY SETTLEMENT PROGRAM (ESP): ESP remains as one of the Court's ADR programs (see Local Rule 4.3) but parties must select the program – the Court no longer will order parties into ESP.

Operation: Panels of pre-screened attorneys (one plaintiff, one defense counsel) each with at least 10 years' trial experience provide a minimum of two hours of settlement conference time, including evaluation of strengths and weakness of a case and potential case value. On occasion, a panelist with extensive experience in both plaintiff and defense roles serves as a sole panelist. BASF handles notification to all parties, conflict checks with the panelists, and full case management. The success rate for the program is 78% and the satisfaction rate is 97%. Full procedures are at www.sfbar.org/esp.

Cost: BASF charges an administrative fee of $295 per party with a cap of $590 for parties represented by the same counsel. Waivers are available to those who qualify. For more information, call Marilyn King at 415-782-8905, email adr@sfbar.org or see enclosed brochure.

(B) MANDATORY SETTLEMENT CONFERENCES: Parties may elect to apply to the Presiding Judge's department for a specially-set mandatory settlement conference. See Local Rule 5.0 for further instructions. Upon approval of the Presiding Judge, the court will schedule the conference and assign the case for a settlement conference.

## 2) MEDIATION

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law.

(A) MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO, in cooperation with the Superior Court is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. While it is best to utilize the program at the outset of litigation, parties may use the program at any time while a case is pending.

Operation: Experienced professional mediators, screened and approved, provide one hour of preparation time and the first two hours of mediation time. Mediation time beyond that is charged at the mediator's hourly rate. BASF pre-screens all mediators based upon strict educational and experience requirements. Parties can select their mediator from the panels at www.sfbar.org/mediation or BASF can assist with mediator selection. The BASF website contains photographs, biographies, and videos of the mediators as well as testimonials to assist with the selection process. BASF staff handles conflict checks and full case management. Mediators work with parties to arrive at a mutually agreeable solution. The success rate for the program is 64% and the satisfaction rate is 98%.

Cost: BASF charges an administrative fee of $200 per party. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waivers of the administrative fee are available to those who qualify. For more information, call Karen King at 415-782-8905, email adr@sfbar.org or see the enclosed brochure.

(B) JUDICIAL MEDIATION provides mediation with a San Francisco Superior Court judge for civil cases, which include but are not limited to, personal injury, construction defect, employment, professional malpractice, insurance coverage, toxic torts and industrial accidents. Parties may utilize this program anytime throughout the litigation process.

Operation: Parties interested in judicial mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court will coordinate assignment of cases to the program. There is no charge for the Judicial Mediation program.

(C) PRIVATE MEDIATION: Although not currently a part of the court's ADR program, parties may elect any private mediator of their choice; the selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will vary depending on the mediator selected.

## 3) ARBITRATION

An arbitrator is a neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

(A) JUDICIAL ARBITRATION: When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial.

Operation: Pursuant to CCP 1141.11, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to judicial arbitration. (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) An arbitrator is chosen from the court's arbitration panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 60 days after the arbitrator's award has been filed. Local Rule 4.2 allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate after the filing of a complaint. There is no cost to the parties for judicial arbitration.

(B) PRIVATE ARBITRATION: Although not currently a part of the court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

TO PARTICIPATE IN ANY OF THE COURT'S ADR PROGRAMS, PLEASE COMPLETE THE ATTACHED STIPULATION TO ADR AND SUBMIT IT TO THE COURT. YOU MUST ALSO CONTACT BASF TO ENROLL IN THE LISTED BASF PROGRAMS. THE COURT DOES NOT FORWARD COPIES OF STIPULATIONS TO BASF.



# Superior Court of California
## County of San Francisco



**HON. JOHN K. STEWART**
**PRESIDING JUDGE**

### Judicial Mediation Program

**JENNIFER B. ALCANTARA**
**ADR ADMINISTRATOR**

The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. Cases that will be considered for participation in the program include, but are not limited to personal injury, professional malpractice, construction, employment, insurance coverage disputes, mass torts and complex commercial litigation. Judicial Mediation offers civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint in an effort to resolve the matter before substantial funds are expended. This program may also be utilized at anytime throughout the litigation process. The panel of judges currently participating in the program includes:

The Honorable Michael I. Begert
The Honorable Suzanne R. Bolanos
The Honorable Angela Bradstreet
The Honorable Andrew Y.S. Cheng
The Honorable Samuel K. Feng
The Honorable Charles F. Haines

The Honorable Harold E. Kahn
The Honorable Curtis E.A. Karnow
The Honorable Charlene P. Kiesselbach
The Honorable James Robertson, II
The Honorable Richard B. Ulmer, Jr.
The Honorable Mary E. Wiss

Parties interested in Judicial Mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program and deliver a courtesy copy to Department 610. A preference for a specific judge may be indicated on the request, and although not guaranteed, every effort will be made to fulfill the parties' choice. Please allow at least 30 days from the filing of the form to receive the notice of assignment. The court's Alternative Dispute Resolution Administrator will facilitate assignment of cases that qualify for the program.

Note: Space and availability is limited. Submission of a stipulation to Judicial Mediation does *not* guarantee inclusion in the program. You will receive written notification from the court as to the outcome of your application.

**Alternative Dispute Resolution**
**400 McAllister Street, Room 103, San Francisco, CA 94102**
**(415) 551-3869**

03/2015 (js)

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and address)

TELEPHONE NO.:

ATTORNEY FOR (Name):

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
400 McAllister Street
San Francisco, CA 94102-4514

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR)

FOR COURT USE ONLY

CASE NUMBER:

DEPARTMENT:

1) The parties hereby stipulate that this action shall be submitted to the following ADR process:

☐ Early Settlement Program of the Bar Association of San Francisco (BASF) - Pre-screened experienced attorneys provide a minimum of 2 hours of settlement conference time for a BASF administrative fee of $295 per party. Waivers are available to those who qualify. BASF handles notification to all parties, conflict checks with the panelists, and full case management. www.sfbar.org/esp

☐ Mediation Services of BASF - Experienced professional mediators, screened and approved, provide one hour of preparation and the first two hours of mediation time for a BASF administrative fee of $295 per party. Mediation time beyond that is charged at the mediator's hourly rate. Waivers of the administrative fee are available to those who qualify. BASF assists parties with mediator selection, conflicts checks and full case management. www.sfbar.org/mediation

☐ Private Mediation - Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the internet.

☐ Judicial Arbitration - Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no equitable relief is sought. The court appoints a pre-screened arbitrator who will issue an award. There is no fee for this program. www.sfsuperiorcourt.org

☐ Judicial Mediation - The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. There is no fee for this program. www.sfsuperiorcourt.org

Judge Requested (see list of Judges currently participating in the program): _____

Date range requested for Judicial Mediation (from the filing of stipulation to Judicial Mediation):

☐ 30-90 days   ☐ 90-120 days   ☐ Other (please specify)

☐ Other ADR process (describe) _____

2) The parties agree that the ADR Process must be completed by (date): _____

3) Plaintiff(s) and Defendant(s) further agree as follows:

_____

Name of Party Stipulating                          Name of Party Stipulating

Name of Party or Attorney Executing Stipulation    Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney                     Signature of Party or Attorney

☐ Plaintiff ☐ Defendant ☐ Cross-defendant         ☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Dated: _____                             Dated: _____

☐ Additional signature(s) attached

CM-110

| | FOR COURT USE ONLY |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | |

TELEPHONE NO.:                    FAX NO. (Optional):

E-MAIL ADDRESS (Optional):

ATTORNEY FOR (Name):

SUPERIOR COURT OF CALIFORNIA, COUNTY OF

STREET ADDRESS:

MAILING ADDRESS:

CITY AND ZIP CODE:

BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| CASE MANAGEMENT STATEMENT | CASE NUMBER: |
|---|---|
| (Check one): ☐ UNLIMITED CASE (Amount demanded exceeds $25,000) ☐ LIMITED CASE (Amount demanded is $25,000 or less) | |

A CASE MANAGEMENT CONFERENCE is scheduled as follows:

Date:                    Time:                    Dept.:         Div.:         Room:

Address of court (if different from the address above):

☐ Notice of Intent to Appear by Telephone, by (name):

INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.

1. Party or parties (answer one):
   a. ☐ This statement is submitted by party (name):
   b. ☐ This statement is submitted jointly by parties (names):

2. Complaint and cross-complaint (to be answered by plaintiffs and cross-complainants only)
   a. The complaint was filed on (date):
   b. ☐ The cross-complaint, if any, was filed on (date):

3. Service (to be answered by plaintiffs and cross-complainants only)
   a. ☐ All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served (specify names and explain why not):
      (2) ☐ have been served but have not appeared and have not been dismissed (specify names):
      (3) ☐ have had a default entered against them (specify names):
   c. ☐ The following additional parties may be added (specify names, nature of involvement in case, and date by which they may be served):

4. Description of case
   a. Type of case in ☐ complaint ☐ cross-complaint   (Describe, including causes of action).

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. July 1, 2011]

**CASE MANAGEMENT STATEMENT**

Cal. Rules of Court,
rules 3.720–3.730
www.courts.ca.gov

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
| --- | --- |
| DEFENDANT/RESPONDENT: | |

4. b  Provide a brief statement of the case, including any damages. (If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date (indicate source and amount), estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)

☐ (If more space is needed, check this box and attach a page designated as Attachment 4b.)

5. Jury or nonjury trial
The party or parties request ☐ a jury trial ☐ a nonjury trial. (If more than one party, provide the names of all parties requesting a jury trial).

6. Trial date
   a. ☐ The trial has been set for (date):
   b. ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint (if not, explain):
   c. ☐ Dates on which parties or attorneys will not be available for trial (specify dates and explain reasons for unavailability):

7. Estimated length of trial
The party or parties estimate that the trial will take (check one):
   a. ☐ days (specify number):
   b. ☐ hours (short causes) (specify):

8. Trial representation (to be answered for each party)
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
   a. Attorney:
   b. Firm:
   c. Address:
   d. Telephone number:
   e. E-mail address:
   ☐ Additional representation is described in Attachment 8.

   f. Fax number:
   g. Party represented:

9. Preference
   ☐ This case is entitled to preference (specify code section):

10. Alternative dispute resolution (ADR)
   a. ADR information package. Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 for information about the processes available through the court and community programs in this case.
      (1) For parties represented by counsel: Counsel ☐ has ☐ has not provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.
      (2) For self-represented parties: Party ☐ has ☐ has not reviewed the ADR information package identified in rule 3.221.
   b. Referral to judicial arbitration or civil action mediation (if available).
      (1) ☐ This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.
      (2) ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.
      (3) ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. (specify exemption):

| PLAINTIFF/PETITIONER: | | | CASE NUMBER: |
| DEFENDANT/RESPONDENT: | | | |

10. ADR information. Indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in (check all that apply and provide the specified information):

| | The party or parties completing this form are willing to participate in the following ADR processes (check all that apply): | If the party or parties completing this form in the case have agreed to participate in or have already completed an ADR process or processes, indicate the status of the processes (attach a copy of the parties' ADR stipulation): |
|---|---|---|
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled<br>☐ Mediation session scheduled for (date):<br>☐ Agreed to complete mediation by (date):<br>☐ Mediation completed on (date): |
| (2) Settlement conference | ☐ | ☐ Settlement conference not yet scheduled<br>☐ Settlement conference scheduled for (date):<br>☐ Agreed to complete settlement conference by (date):<br>☐ Settlement conference completed on (date): |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled<br>☐ Neutral evaluation scheduled for (date):<br>☐ Agreed to complete neutral evaluation by (date):<br>☐ Neutral evaluation completed on (date): |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled<br>☐ Judicial arbitration scheduled for (date):<br>☐ Agreed to complete judicial arbitration by (date):<br>☐ Judicial arbitration completed on (date): |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled<br>☐ Private arbitration scheduled for (date):<br>☐ Agreed to complete private arbitration by (date):<br>☐ Private arbitration completed on (date): |
| (6) Other (specify): | ☐ | ☐ ADR session not yet scheduled<br>☐ ADR session scheduled for (date):<br>☐ Agreed to complete ADR session by (date):<br>☐ ADR completed on (date): |

CM-110 [Rev. July 1, 2011]                    CASE MANAGEMENT STATEMENT                    Page 5 of 5

CM-110

| | |
|---|---|
| PLAINTIFF/PETITIONER | CASE NUMBER: |
| DEFENDANT/RESPONDENT: | |

**11. Insurance**
   a. ☐ Insurance carrier, if any, for party filing this statement *(name)*:
   b. Reservation of rights: ☐ Yes ☐ No
   c. ☐ Coverage issues will significantly affect resolution of this case *(explain)*:

**12. Jurisdiction**
   Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.
   ☐ Bankruptcy ☐ Other *(specify)*:
   Status:

**13. Related cases, consolidation, and coordination**
   a. ☐ There are companion, underlying, or related cases.
      (1) Name of case:
      (2) Name of court:
      (3) Case number:
      (4) Status:
      ☐ Additional cases are described in Attachment 13a.
   b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party)*:

**14. Bifurcation**
   ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons)*:

**15. Other motions**
   ☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues)*:

**16. Discovery**
   a. ☐ The party or parties have completed all discovery.
   b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

| Party | Description | Date |
|---|---|---|

   c. ☐ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify)*:

**CASE MANAGEMENT STATEMENT**

  
CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Economic litigation**

   a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

   b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed (if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):

**18. Other issues**

   ☐ The party or parties request that the following additional matters be considered or determined at the case management conference (specify):

**19. Meet and confer**

   a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court (if not, explain):

   b.   After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following (specify):

**20. Total number of pages attached (if any):** _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date

_____       ► _____

(TYPE OR PRINT NAME)            (SIGNATURE OF PARTY OR ATTORNEY)

_____       ► _____

(TYPE OR PRINT NAME)            (SIGNATURE OF PARTY OR ATTORNEY)

   ☐ Additional signatures are attached.



# Superior Court of California
# County of San Francisco

## Expedited Jury Trial Information Sheet

### What is an expedited jury trial?

An expedited jury trial is a trial that is much faster and has a smaller jury than a traditional jury trial. An expedited jury trial differs from a regular jury trial in several ways:

- **The trial will be shorter.** Each side has 3 hours to make opening statements, present witnesses and evidence, and make closing statements.

- **The jury will be smaller.** There will be 8 jurors instead of 12.

- **Choosing the jury will be faster.** The parties will exercise fewer preemptory challenges.

- **Parties will waive some post trial motions and rights to appeal.** Appeals are allowed only if there is: (1) Misconduct of the judicial officer that materially affected substantial rights of a party; (2) Jury misconduct; or (3) Corruption or fraud or some other bad act that prevented a fair trial.

  In addition, parties may not ask the judge to set the jury verdict aside, except on those same grounds.

### Does the jury have to reach a unanimous decision?

No. Just as in a traditional civil jury trial, only three-quarters of the jury must agree in order to reach a decision in an expedited jury trial. With 8 people on the jury, that means that at least 6 of the jurors must agree on the verdict in an expedited jury trial.

### Is the decision of the jury binding on the parties?

Generally, yes. A verdict from a jury in an expedited jury trial is like a verdict in a traditional jury trial. However, parties who take part in expedited jury trials are allowed to make an agreement before the trial that guarantees that the defendant will pay a certain amount to the plaintiff even if the jury decides on a lower payment or no payment. That agreement may also impose a cap, or maximum, on the highest amount that a defendant has to pay, even if the jury decides on a higher amount. These agreements are commonly known as "high/low agreements."

### How do I qualify for an expedited jury trial?

The process can be used in any civil case. To have an expedited jury trial, both sides must want one. Each side must agree that it will use only three hours to put on its case and agree to the other rules described above. This agreement must be put in writing in a Stipulation and submitted along with a Proposed Consent Order Granting an Expedited Jury Trial, which is given to the court for approval. The court will usually agree to the Consent Order.

### How do I request an expedited jury trial?

To have an expedited jury trial, both sides must submit a Stipulation and Proposed Consent Order for Expedited Jury Trial to the court for approval. This may happen at three stages of litigation:

1) At Filing and Prior to Setting of a Trial Date: Parties may submit a Stipulation to Expedited Jury Trial to Dept. 610 using the attached short form (see below). Parties must

also submit a Proposed Consent Order for Expedited Jury Trial to Dept. 610.

2) After a Trial Date has been Set: Parties submit a Stipulation and Proposed Consent Order for Expedited Jury Trial directly to Dept. 206 at least 30 days prior to the assigned trial date.

3) After Trial Assignment: A Proposed Consent Order for Expedited Jury Trial may be submitted immediately to the assigned trial department not less than 30 days prior to the assigned trial date.

Also, after a case is assigned to a particular judge for trial, the parties may ask the trial judge to have an Expedited Jury Trial, and the judge may permit the parties to then sign the appropriate Stipulation and Proposed Consent Order for Expedited Jury Trial.

**Can I change my mind after agreeing to an expedited jury trial?**

No, unless the other side or the court agrees. Once you and the other side have agreed to take part in an expedited jury trial, the agreement is binding on both sides.

---

### Expedited Jury Trial Request
*Please submit a copy of this request to Dept. 610.*

Case No. _____

Case Name: _____ V. _____

The parties would like this action to be submitted to an Expedited Jury Trial.

The parties shall submit a consent order to the Court on or by _____

| | | |
|---|---|---|
| _____ | _____ | _____ |
| Name of Party | Name of Party/Attorney | Signature of Party |
| | | Dated: _____ |
| _____ | _____ | _____ |
| Name of Party | Name of Party/Attorney | Signature of Party |
| | | Dated: _____ |
| _____ | _____ | _____ |
| Name of Party | Name of Party/Attorney | Signature of Party |
| | | Dated: _____ |

Please note; a [Proposed] Consent Order for Expedited Jury Trial is still required in addition to this stipulation form.

---

You can find the law and rules governing expedited jury trials in Code of Civil Procedure sections 630.01–630.12 and in rules 3.1545–3.1552 of the California Rules of Court. You can find these at any county law library or online. The statutes are online at *www.leginfo.ca.gov/calaw.html*. The rules are at *www.courts.ca.gov/rules*.

*Information adapted from Judicial Council's Expedited Jury Trial Information Sheet EJT-010-INFO, New January 1, 2011*



## What is ESP?

The Bar Association of San Francisco's **Early Settlement Program** (ESP) is available as one of San Francisco Superior Court's Alternative Dispute Resolution (ADR) programs (Local Rule 4.3).

ESP is a **highly successful** ADR program that handles cases in areas of law such as business, personal injury, employment, labor, civil rights, discrimination, insurance, malpractice, landlord/tenant, and many others.

ESP is **unique** in that the panelists, in helping you move toward settlement, can provide you confidential feedback about their evaluation of your case, including opinions as to potential case value.

For more information as well as the complete Policies & Procedures, go to: **www.sfbar.org/esp**

## Step

The forms you need can be found at **www.sfbar.org/esp**, or email adr@sfbar.org or call 415-782-8905 for a packet to be sent to you.

❶ Please complete the ESP Agreement and return it to BASF via email at adr@sfbar.org or by fax to 415-989-0381. You don't have to get the other parties to sign, just send yours.

❷ When all parties have signed the ESP Agreement, you will be sent the Notice of ESP, along with an invoice.

❸ There is a $295 administrative fee per party, with a cap of $590 for multiple parties represented by the same attorney. You can pay by check, money order or credit card.

❹ Send your administrative fee by fax, email or mail to: BASF / ESP, 301 Battery Street, Third Floor, San Francisco, California 94111.

❺ When BASF receives the fees from all parties, your matter will be assigned to a panelist (or panel of 2), who you will work with to set the date, time and location for your conference.

❻ If you must reschedule your ESP conference date, work with the other side and your panelist(s) to set the new date. BASF does not need to be notified.

❼ Before your conference, provide a copy of your description of the dispute to all parties and panelists. BASF does not need a copy.

❽ If the matter is settled in your ESP conference, congratulations!

❾ If the matter is not settled in your ESP conference, your initial court date remains the same.

Experienced mediators are available in the following areas

Business
Civil Rights
Commercial
Construction
Contracts
Disability
Discrimination
Education
Employment & Labor
Energy
ESOP
Environmental Matters
Fee Disputes
Financial
Government
Insurance
Intellectual Property
Intra-Organizational
Labor
Landlord/Tenant
Land Use
LGBT Matters
Malpractice — Legal, Medical, Professional
Partnership Dissolutions
Personal Injury
Probate / Trusts
Product Liability
Real Estate
Securities
Sexual
Uninsured Motorist
And more...

# TESTIMONIALS

"This was the third attempt to mediate this case, and the BASF mediator was far and away the best mediator. I dare say that we would not have settled today but for his efforts."

*George Yuhas, Esq.*
*Orrick, Herrington & Sutcliffe LLP*

"We had an excellent experience and, after 8 1/2 hours of mediation, [the BASF mediator] settled a very difficult case involving claims against four clients of ours by a wealthy investor who claimed inadequate disclosure was made."

*Robert Charles Friese, Esq.*
*Shartsis Friese LLP*

"When the other side made their offer, I thought there was no way we would reach an agreement – we were too far apart, but the mediator brought us together. He saved me a lot of time and aggravation by facilitating a settlement. Thanks!"

*Leslie Caplan*
*Global Warming Campaign Manager*
*Bluewater Network*

"BASF staff was very helpful – stayed on the task and kept after a hard to reach party. The mediator was great!"

*Mark Abelson, Esq.*
*Campagnoli, Abelson & Campagnoli*

"The [BASF] mediator was excellent. He was effective with some strong, forceful personalities."

*Denise A. Leadbetter, Esq.*
*Zacks, Utrecht & Leadbetter*



BASF
www.sfbar.org/mediation

adr@sfbar.org or
415 982 1600



FOR OUTSTANDING ADR SERVICES
Voted into the Hall of Fame
In The Recorder's "Best of Poll"

MEDIATION SERVICES



THE BAR ASSOCIATION OF
SAN FRANCISCO

**QUALITY**            **EXPERIENCE**            **TRUST**

## WHAT IS BASF'S MEDIATION SERVICE?

The Bar Association of San Francisco's Mediation Services is a private mediation service which will assist you with almost any type of dispute, from simple contract disputes to complex commercial matters.

## WHO ARE THE MEDIATORS?

They are established mediators who have private mediation practices and have met our extensive experience requirements. By going through BASF you receive the services of these highly qualified mediators at a great value.

## HOW DO I LEARN MORE ABOUT THE MEDIATORS?

BASF's website at www.sfbar.org/mediation provides bios, photos and hourly rates of mediators. You can search by name or by area of law needed for your case. BASF staff is always available to assist you with selection or to answer questions.

## HOW MUCH DOES THE SERVICE COST?

A $295 per party administrative fee is paid to BASF at the time the Consent to Mediate form is filed. This fee covers the first hour of mediator preparation time and the first two hours of session time. Time beyond that is paid at the mediator's normal hourly rate.

## HOW IS THE MEDIATOR CHOSEN?

You may request a specific mediator from our website (www.sfbar.org/mediation) and indicate your choice on the BASF Consent to Mediate form, or you may indicate on the form that you would like BASF staff to assist with the selection.

## WHY SHOULD I GO THROUGH BASF? CAN'T I JUST CALL THE MEDIATOR DIRECTLY?

BASF mediators have agreed to provide three free hours as a service to BASF. If you go directly to one of our mediators, you do not qualify for the free hours unless you notify us. Once you have filed with us, you will talk directly to the mediator to ask questions and to set a convenient mediation date and time.

## HOW LONG IS THE MEDIATION SESSION?

The time spent in mediation will vary depending on your dispute. BASF mediators are dedicated to reaching a settlement, whether you need a few hours or several days.

## WHO CAN USE THE SERVICE?

BASF mediation can be utilized by anyone and is NOT limited to San Francisco residents or issues. Also, the service may be used before a court action is filed or at any time during a court action.

## OUR CASE IS FILED IN COURT, HOW DO WE USE BASF'S MEDIATION SERVICES?

When you file the San Francisco Superior Court's Stipulation to ADR form, check the box indicating "Mediation Services of BASF." Then complete BASF's Consent to Mediate form found on our website and file it with us. (If the matter was filed in a different county, please check with that court for the appropriate process.)

## WE ARE ON A DEADLINE; HOW QUICKLY CAN WE MEDIATE?

Once all parties have filed all the paperwork, BASF can normally have you in touch with the mediator within a day or two. If there is a deadline, BASF staff will give the matter top priority.

## WHAT TYPES OF DISPUTES CAN I MEDIATE?

BASF mediators are trained in 30+ areas of law. If you don't see the area you need on our website or in this brochure, contact us; it is very likely we can match your need with one of our panelists.

## MORE INFORMATION

Visit our website (www.sfbar.org/mediation) where you can search by name or by area of law. For personal assistance, please call 415-982-1600.

# Exhibit 2

## DECLARATION OF STEVEN D. GOULD

STATE OF CALIFORNIA        )
                           )
COUNTY OF Riverside        )

Steven D. Gould hereby declares:

1.    I am a citizen of the United States of America. I am over the age of eighteen and am competent to discuss the issues set forth below. This declaration is based on my personal knowledge.

2.    I am one of multiple Industrial Turf and Ornamental (IT&O) business account managers for Monsanto Company. Prior to February 2016, I held the position of chemical account manager for Monsanto Company.

3.    I have not been properly served with a copy of the complaint in this lawsuit. A copy of the complaint was left in an unmarked envelope, outside the door on the front porch of my home when no one was home. The envelope was not accompanied by any information as to when it was left or who left it there. No copies of the complaint have been mailed to me. By this declaration, I am not waiving service of process or voluntarily entering a general appearance in this action, but I offer this declaration as a witness to the facts set forth herein, understanding that Monsanto Company will submit it in support of a contention that I have been fraudulently joined in this lawsuit.

4.    Based on the allegations of the complaint, I am aware that Dewayne Johnson alleges that he was diagnosed with non-Hodgkin's lymphoma in August 2014 from alleged exposure to Roundup® and Ranger Pro® that allegedly occurred while Mr. Johnson was working as an employee of the Benicia Unified School District in California.

5.      I have never sold Roundup®, Ranger Pro®, or any other glyphosate-containing products to the Benicia Unified School District, California or the City of Benicia, California.

6.      Prior to 2015, I was not the account manager for named defendants Wilbur-Ellis Company LLC and Wilbur-Ellis Feed, LLC, which Mr. Johnson's complaint alleges to be the distributor(s) of the glyphosate-containing products to which he was allegedly exposed.

7.      I am only one of multiple employees of Monsanto Company who sell Roundup®, Ranger Pro® and other glyphosate-containing products in California, and I have never been the exclusive seller or exclusive account manager for buyers in California or the exclusive seller or exclusive account manager for particular distributors that buy these products from Monsanto. I do not sell and have not made sales directly to product end-users; I sell only to distributors.

8.      I am aware of no records and have no knowledge of any sales of Roundup® and Ranger Pro® that I made, which resulted in products reaching the Benicia Unified School District or the City of Benicia.

9.      I do not have any knowledge that glyphosate-containing products can cause cancer. In fact, I was not aware of even any allegations of such a risk until the IARC report in 2015. There is absolutely no factual basis in the complaint for the statement that I was "aware of their [alleged] carcinogenic or potentially carcinogenic properties," and I do not know of any factual basis that would support that assertion, which I expressly deny.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 11, 2016, in _Murrieta_ , CA.

Steven D. Gould

Exhibit 3

<u>**DECLARATION OF SCOTT M. HUSHBECK**</u>

STATE OF CALIFORNIA       )
                                   )
COUNTY OF SACRAMENTO   )

Scott M. Hushbeck hereby declares:

1.      I am a citizen of the United States of America. I am over the age of eighteen and am competent to discuss the issues set forth below. This declaration is based on my personal knowledge, including my knowledge of the corporate records of Wilbur-Ellis Company LLC and Wilbur-Ellis Feed, LLC (collectively "Wilbur-Ellis").

2.      I am a Vice President and have worked for Wilbur-Ellis or its subsidiaries since 1999. My office address is 2400 Del Paso Road, Suite 150, Sacramento, CA 95834. My responsibilities include oversight of Wilbur-Ellis' sales and marketing of glyphosate-containing products in California, including sales and marketing of glyphosate-containing products of Monsanto Company.

3.      I have been informed that Dewayne Johnson alleges that he was diagnosed with non-Hodgkin lymphoma in August 2014 from alleged exposure to Roundup® and RangerPro® while working as an employee of the Benicia Unified School District in California.

4.      Wilbur-Ellis Feed, LLC did not exist as a corporate entity until September 2015.

5.      Based on review of Wilbur-Ellis' accounting records, Wilbur-Ellis has not sold Roundup®, RangerPro®, or any other glyphosate-containing products to the Benicia Unified School District (CA) or the City of Benicia (CA).

6.     Based on all available information, Wilbur-Ellis did not sell Roundup®, RangerPro®, or any other glyphosate-containing products to the Benicia Unified School District (CA) or the City of Benicia (CA).

7.     Prior to 2015, Wilbur-Ellis did not have any knowledge of any potential risk of cancer, including non-Hodgkin lymphoma, from Roundup®, RangerPro®, or any other glyphosate-containing products.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 10, 2016, in Sacramento, CA.

Scott M. Hushbeck

2

Exhibit 4

# U.S. District Court
## District of Hawaii (Hawaii)
## CIVIL DOCKET FOR CASE #: 1:16-cv-00043-JMS-RLP

Sheppard et al v. Monsanto Company
Assigned to: JUDGE J. MICHAEL SEABRIGHT
Referred to: MAGISTRATE JUDGE RICHARD L. PUGLISI
Cause: 28:1332 Diversity-Product Liability

Date Filed: 02/02/2016
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

### Plaintiff
**Christine Sheppard**

represented by **Brian K. Mackintosh**
841 Bishop St., Suite 2201
Honolulu, HI 96813
521-3336
Email: bmackphd@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Miller**
The Miller Firm LLC
The Sherman Building
108 Railroad Ave
Orange, VA 22960
(540) 672-4224
Fax: (540) 672-3055
Email: mmiller@millerfirmllc.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy Litzenburg**
The Miller Firm LLC
The Sherman Building
108 Railroad Ave
Orange, VA 22960
(540) 672-4224
Fax: (540) 672-3055
Email: tlitzenburg@millerfirmllc.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

### Plaintiff
**Kenneth Sheppard**

represented by **Brian K. Mackintosh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Michael J. Miller
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Timothy Litzenburg
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

Monsanto Company          represented by   Eric G. Lasker
Hollingsworth LLP
1350 I Street N.W.
Washington, DC 20005
(202) 898-5800
Fax: (202) 682-1639
Email: elasker@hollingsworthllp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Joe G. Hollingsworth
Hollingsworth LLP
1350 I Street, N.W.
Washington, DC 20005
(202) 898-5800
Fax: (202) 682-1639
Email:
jhollingsworth@hollingsworthllp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Katharine R. Latimer
Hollingsworth LLP
1350 I Street, N.W.
Washington, DC 20005
(202) 898-5800
Fax: (202) 682-1639
Email: klatimer@hollingsworthllp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

         3/14/2016 11:37 AM

LAW OFFICE OF BRIAN K. MACKINTOSH
   BRIAN K. MACKINTOSH          9525
841 Bishop Street, Suite 2201
Honolulu, Hawaii  96813
Telephone:  (808) 521-3336
Facsimile: (808) 566-0347
bmackphd@gmail.com

*Attorney for Plaintiffs*
CHRISTINE SHEPPARD
KENNETH SHEPPARD

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| CHRISTINE SHEPPARD and KENNETH SHEPPARD,  *Plaintiffs,*  vs.  MONSANTO COMPANY,  *Defendant.* | CIVIL NO. 16-43  COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS |

## **COMPLAINT**

1. In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had

become the most-used active ingredient in American agriculture with 85–90 millions pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

2. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

3. Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

4. On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an

2

evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5. On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6. The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

3

## JURISDICTION AND VENUE

9. Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiff Christine Sheppard is a citizen of a different state from the Defendant Monsanto Company's states of citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

10. This Court has personal jurisdiction over Monsanto under Hawaii Revised Statute ("HRS") § 634-35, because Monsanto knows or should have known that its Roundup® products are sold throughout the State of Hawaii.

11. In addition, Monsanto maintains sufficient contacts with the State of Hawaii such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

12. Venue is proper within this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within this judicial District.

## THE PARTIES

### Plaintiff

13. Plaintiff Christine Sheppard resides in Oceanside, California. Kenneth Sheppard is her husband. Formerly, she owned and worked a coffee farm in Hawaii. She used Roundup to kill weeds on her coffee farm from approximately 1995 to 2004.

4

### Defendant

14. Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

15. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

### FACTS

16. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

17. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

18. For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the

WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable

cause of cancer. Those most at risk are farm workers and other individuals with

workplace exposure to Roundup®, such as workers in garden centers, nurseries,

and landscapers. Agricultural workers are, once again, victims of corporate greed.

Monsanto assured the public that Roundup® was harmless. In order to prove this,

Monsanto championed falsified data and attacked legitimate studies that revealed

its dangers. Monsanto led a prolonged campaign of misinformation to convince

government agencies, farmers and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

19. The herbicidal properties of glyphosate were discovered in 1970 by

Monsanto chemist John Franz. The first glyphosate-based herbicide was

introduced to the market in the mid-1970s under the brand name Roundup®. From

the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide

for widespread commercial and consumer use. It still markets Roundup® as safe

today.

### *Registration of Herbicides under Federal Law*

20. The manufacture, formulation and distribution of herbicides, such as

Roundup®, are regulated under the Federal Insecticide, Fungicide, and

Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that

all pesticides be registered with the Environmental Protection Agency ("EPA" or

6

"Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

21. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

22. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

23. The EPA and the State of Hawaii registered Roundup® for distribution, sale, and manufacture in the United States and the State of Hawaii.

7

24. FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

25. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

26. In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment ―in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

8

### Scientific Fraud Underlying the Marketing and Sale of

### Glyphosate/Roundup

27. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

28. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

29. In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

30. In 1976, the United States Food and Drug Administration ("FDA")
performed an inspection of IBT that revealed discrepancies between the raw data
and the final report relating to the toxicological impacts of glyphosate. The EPA
subsequently audited IBT; it too found the toxicology studies conducted for the
Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine
falsification of data" at IBT, that it was "hard to believe the scientific integrity of
the studies when they said they took specimens of the uterus from male rabbits."

31. Three top executives of IBT were convicted of fraud in 1983.

32. In the second incident of data falsification, Monsanto hired Craven
Laboratories in 1991 to perform pesticide and herbicide studies, including for
Roundup®. In that same year, the owner of Craven Laboratories and three of its
employees were indicted, and later convicted, of fraudulent laboratory practices in
the testing of pesticides and herbicides.

33. Despite the falsity of the tests that underlie its registration, within a few
years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

34. The success of Roundup® was key to Monsanto's continued reputation
and dominance in the marketplace. Largely due to the success of Roundup® sales,
Monsanto's agriculture division was out-performing its chemicals division's
operating income, and that gap increased yearly. But with its patent for glyphosate

expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

35. In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

36. Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of***

***Roundup®***

37. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Roundup with " confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup.

38. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

13

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

\* \* \*

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

\* \* \*

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

\* \* \*

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

\* \* \*

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and,

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

39. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

14

40. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### Classifications and Assessments of Glyphosate

41. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

42. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

43. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the

Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

44. In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

45. In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

46. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC

16

Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

47. The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

48. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

49. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

50. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

51. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

52. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

53. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

54. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

55. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

18

56. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

57. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

58. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

19

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

59. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### Recent Worldwide Bans on Roundup®/Glyphosate

60. Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of

2015. In issuing the ban, the Dutch Parliament member who introduced the
successful legislation stated: "Agricultural pesticides in user-friendly packaging
are sold in abundance to private persons. In garden centers, Roundup® is promoted
as harmless, but unsuspecting customers have no idea what the risks of this product
are. Especially children are sensitive to toxic substances and should therefore not
be exposed to it."

61. The Brazilian Public Prosecutor in the Federal District requested that the
Brazilian Justice Department suspend the use of glyphosate.

62. France banned the private sale of Roundup® and glyphosate following
the IARC assessment for Glyphosate.

63. Bermuda banned both the private and commercial sale of glyphosates,
including Roundup®. The Bermuda government explained its ban as follows:
"Following a recent scientific study carried out by a leading cancer agency, the
importation of weed spray 'Roundup' has been suspended."

64. The Sri Lankan government banned the private and commercial use of
glyphosates, particularly out of concern that glyphosate has been linked to fatal
kidney disease in agricultural workers.

65. The government of Columbia announced its ban on using Roundup®
and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine,
because of the WHO's finding that glyphosate is probably carcinogenic.

### *Plaintiff's Exposure to Roundup®*

66. Plaintiff Christine Sheppard began applying Roundup to her commercial coffee crop in or around 1995. She applied the product routinely to her farm, on which she lived, until 2004.

67. Ms. Sheppard was diagnosed with non-Hodgkins lymphoma in 2003, following eight years of Roundup application.

68. As a result of this illness, she has had to cease farming coffee, has sold the farm, and has moved to California where she continues to undergo treatment and surveillance for her lymphoma.

## CLAIM ONE

## STRICT LIABILITY (DESIGN DEFECT)

69. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

70. Plaintiff brings this strict liability claim against Defendant for defective design.

71. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and

22

supervision of Defendant. At all times relevant to this litigation, Defendant

designed, researched, developed, manufactured, produced, tested, assembled,

advertised, promoted, marketed, sold, and distributed the Roundup® products used

by the Plaintiff, as described above.

72. At all times relevant to this litigation, Defendant's Roundup® products

were manufactured, and designed in an unsafe, defective, and inherently dangerous

manner that was dangerous for use by or exposure to the public, and, in particular,

the Plaintiff.

73. At all times relevant to this litigation, Defendant's Roundup® products

reached the intended consumers, handlers, and users or other persons coming into

contact with these products in New York and throughout the United States,

including Plaintiff, without substantial change in their condition as designed,

manufactured, sold, distributed, and marketed by Defendant.

74. Defendant's Roundup® products, as researched, tested, developed,

designed, licensed, manufactured, packaged, distributed, sold, and marketed by

Defendant were defective in design and formulation in that when they left the

hands of the Defendant's manufacturers and/or suppliers, they were unreasonably

dangerous and dangerous to an extent beyond that which an ordinary consumer

would contemplate.

75. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

76. At all times relevant to this action, Defendant knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

77. Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, distributed, sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways: a. When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b. When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Defendant's Roundup®

products contained unreasonably dangerous design defects and were not

reasonably safe when used in a reasonably anticipated or intended manner.

d. Defendant did not sufficiently test, investigate, or study its Roundup®

products and, specifically, the active ingredient glyphosate.

e. Exposure to Roundup® and glyphosate-containing products presents a

risk of harmful side effects that outweigh any potential utility stemming from the

use of the herbicide.

f. Defendant knew or should have known at the time of marketing its

Roundup® products that exposure to Roundup® and specifically, its active

ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g. Defendant did not conduct adequate post-marketing surveillance of its

Roundup® products.

h. Defendant could have employed safer alternative designs and

formulations.

78. Plaintiff was exposed to Defendant's Roundup® products in the course

of her employment as a horticultural worker, as described above, without

knowledge of their dangerous characteristics.

25

79. At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

80. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

81. The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

82. At the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

83. Defendant's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff herein.

84. Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

85. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained her injuries.

86. Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

87. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

88. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM TWO

### STRICT LIABILITY (FAILURE TO WARN)

89. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

90. Plaintiff brings this strict liability claim against Defendant for failure to warn.

91. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

92. Defendant researched, developed, designed, tested, manufactured, inspected, distributed, marketed, promoted, sold, and otherwise released into the

stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, Plaintiff's employer, Plaintiff's co-workers, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

93. At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

94. At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

95. At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and

consumers of its product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

96. Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff and the horticultural company who employed her.

97. Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

98. At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in New York and throughout the United States,

including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, and marketed by Defendant.

99. Plaintiff was exposed to Defendant's Roundup® products in the course of her employment as a horticultural worker, as described above, without knowledge of their dangerous characteristics.

100. At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

101. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

102. Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

103. The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled

horticultural workers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

104. To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

105. As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff in the course of her employment as a horticultural worker.

106. Defendant is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically

relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate.

107. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained their injuries.

108. Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein and the company who employed Plaintiff could have obtained alternative herbicides.

109. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

110. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further

relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM THREE

### NEGLIGENCE

111. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

112. Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

113. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

114. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the

34

potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

115. At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

116. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

117. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

118. As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or

35

consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

119. Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

120. Defendant's negligence included: a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup® products;

g. Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h. Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j. Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

121. Defendant knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

122. Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

123. Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

124. Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Defendant's reckless conduct therefore warrants an award of punitive damages.

125. As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

126. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM FOUR

### BREACH OF IMPLIED WARRANTIES

127. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

128. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

129. Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers—including Plaintiff—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

130. Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

131. Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

132. Upon information and belief, Plaintiff was at all relevant times in privity with Defendant.

133. Plaintiff is the intended third-party beneficiaries of implied warranties made by Defendant to the purchasers of its horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

134. The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

135. At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of Roundup®.

136. Defendant intended that its Roundup® products be used in the manner in which Plaintiff in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

137. In reliance upon Defendant's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

138. Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

139. Defendant breached its implied warranty to Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

140. The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

141. As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, have suffered economic loss

42

(including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

142. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM FIVE

## BREACH OF EXPRESS WARRANTIES

143. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

144. The law imposes a duty on Monsanto to be responsible in the event the product sold, namely Roundup, is fit for the use and purposes intended.

145. Defendant breached its contractually assumed implied warranty by supplying a product that caused Mrs. Sheppard non-Hodgkin lymphoma and related injuries.

146. Any warranty disclaimer or limitation of liability clause offered by Defendant for a product as dangerous as Roundup would be unconscionable and unenforceable by law.

## CLAIM SIX

## LOSS OF CONSORTIUM

147.  Kenneth Sheppard (hereinafter "Consortium Plaintiff") incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

148.  As a direct and proximate result of Defendant's wrongful acts and omissions Consortium Plaintiff has suffered the loss and/or impairment of Plaintiff's ability to perform services as a wife, because of her injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in their favor and against Monsanto, awarding as follows:

A. compensatory damages in an amount to be proven at trial;

B. punitive damages;

C. costs including reasonable attorneys' fees, court costs, and other litigation expenses; and,

D. any other relief the Court may deem just and proper.

DATED: Honolulu, Hawaii, February 2, 2016.

*Brian K. Mackintosh*
BRIAN K. MACKINTOSH
Attorney for Plaintiffs
CHRISTINE SHEPPARD
KENNETH SHEPPARD

44

# Exhibit 5

1    Richard A. Clark (State Bar No. 39558)
     (rclark@pmcos.com)
2    Steven R. Platt (State Bar No. 245510)
     (splatt@pmcos.com)
3    Parker, Milliken, Clark, O'Hara
     & Samuelian, P.C.
4    A Professional Corporation
     555 South Flower Street, 30th Floor
5    Los Angeles, California 90071-2440
     Telephone:      (213) 683-6607
6    Facsimile:      (213) 683-6669

7    Attorneys for Defendant
     MONSANTO COMPANY
8

9              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                 **FOR THE COUNTY OF SAN FRANCISCO**

11

12   DEWAYNE JOHNSON,                          Case No.  CGC-16-550128

13            Plaintiff
                                               **DEFENDANT MONSANTO COMPANY'S**
14   vs.                                       **NOTICE OF FILING OF NOTICE OF**
                                               **REMOVAL**
15   MONSANTO COMPANY;
     STEVEN D. GOULD;
16   WILBUR-ELLIS COMPANY, LLC; and
     WILBUR-ELLIS FEED, LLC
17

18

19

20

21

22

23

24

25

26

27

28

─────────────────────────────────────────────
          **MONSANTO'S NOTICE OF REMOVAL TO FEDERAL COURT**

1     **TO THE CLERK OF THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF**

2     **RECORD:**

3         **PLEASE TAKE NOTICE** pursuant to 28 U.S.C. § 1446(d) that defendant Monsanto

4     Company has removed this action to the United States District Court for the Northern District of

5     California ("District Court") by the filing of the attached Notice of Removal with the Clerk of the

6     District Court on March 14, 2016. A copy of this Notice is on file with the District Court. The

7     San Francisco County Superior Court may proceed no further unless or until this case is

8     remanded.

9

10    DATED: March 14, 2016             PARKER, MILLIKEN, CLARK, O'HARA &
                                           SAMUELIAN, a Professional Corporation

11

12

13                             By: _____
                                     RICHARD A. CLARK

14                             Attorneys for Defendant
                            MONSANTO COMPANY

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MONSANTO'S NOTICE OF REMOVAL TO FEDERAL COURT**

1

## **PROOF OF SERVICE**

2

Johnson v. Monsanto Company, CGC-16-550128

3

    I am employed in the County of Los Angeles, State of California. I am over the age of 18

4

and not a party to the within action. My business address is 555 South Flower Street, 30th Floor, Los Angeles, California 90071.

5

6

    On March 14, 2016, I served the documents listed below on the persons identified on the attached service list:

7

**DEFENDANT MONSANTO COMPANY'S NOTICE OF FILING OF**

8

**NOTICE OF REMOVAL**

9

☒    (BY MAIL) By placing a true copy in envelope(s) addressed as referenced on

10

ATTACHED SERVICE LIST. The envelope(s) were then sealed and deposited for collection and mailing in accordance with my employer's normal procedures. I am readily

11

familiar with the firm's practice for collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service, with all postage

12

prepaid, at Los Angeles, California, on the same day in the ordinary course of business.

13

☒    (STATE) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

14

15

Executed on March 14, 2016 at Los Angeles, California.

16

17

18

                                          Marianne Hendrix

19

20

21

22

23

24

25

26

27

28

- 3 -

**MONSANTO'S NOTICE OF REMOVAL TO FEDERAL COURT**

1

Service List

2

3    <u>Johnson v. Monsanto Company, CGC-16-550128</u>

4    Curtis G. Hoke
     The Miller Firm LLC
5    The Sherman Building
     108 Railroad Avenue
6    Orange, VA 22960

7    Attorneys for Plaintiff Dewayne Johnson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 4 -

**MONSANTO'S NOTICE OF REMOVAL TO FEDERAL COURT**